OPINION
{¶ 1} The biological parents of both sisters, Taylor 
Tiffany, are appealing the decision of the Montgomery County Common Pleas Court, Juvenile Division, awarding permanent custody of the two children to the Montgomery County Children's Service Agency ("MCCS"). The facts of the matter and reasons for the trial court's decision are set forth in the following excerpts from its decision:
 {¶ 2} "Magistrate Maciorowski filed a Decision on December 18, 2002 granting Permanent Custody of said children to MCCS. The Magistrate found that the Agency had made reasonable efforts to prevent the removal of the children from the home, that both Mr. Mrs. Foucht are unable to demonstrate parenting skills, and that there are no relatives willing and able to accept legal custody of the children. Further, the children have been in foster care since July 17, 2001, which is more than 12 months out of the last 22 months. Said children have been sexually abused and the parents have allowed the children to suffer neglect between the time of the original filing and the motion for permanent custody, thus placement of the children with the parents is a threat to the children's safety. There are reasonable expectations of adoption, as both parents have still not completed their case plans. The Guardian Ad Litem recommends that MCCS be granted permanent custody and both children have expressed a desire not to be returned to their parents.
 {¶ 3} "Upon a careful review of the objections, including the record and transcript, the Court hereby Overrules the same. The Court determines that granting permanent custody to MCCS is in the best interests of the children. It has been shown that the children are dependant and have been in foster care for more than 12 out of the last 22 months in foster care. Reasonable efforts were made to prevent the children's removal from the home. The parents have not completed their case plans, including concerns with domestic violence, substance abuse, housing concerns and parenting ability, so the children will not be able to return to their parents within a reasonable time as set out in O.R.C2151.414.
 {¶ 4} "Granting permanent custody of said children to MCCS is in the best interests of the children because there have been and currently are concerns for the children's safety in the home. The children had been sexually victimized in the past by their half brother, who is currently in jail for this abuse. (Tr. 21). Mr. Foucht has admitted to being the primary perpetrator of domestic violence in his marriage, so the girls have been subjected to this abusive behavior from their father. (Tr. 21). Further, the MMPI results showed that Mr. Foucht is prone to impulsive behavior, has substance abuse problems, and mistrusts others, which the Court feels may endanger the safety of the children. (Tr. 25). Dr. Rivera also stated that Mr. Foucht may have problems differentiating what constitutes abusive behavior and his use of corporal punishment may be excessive for the children. (Tr. 27). The doctor expressed concerns with boundary issues as well with the children, as there have been allegations of inappropriate behavior with the children and unsecured pornography in the house. (Tr. 29). Mr. Foucht has not completed domestic violence classes to resolve some of these issues as well. (Tr. [sic]
 {¶ 5} "As for Mrs. Foucht, Dr. Rivera was concerned that she did not voice empathy or concern for her daughters' negative experiences and did not want the girls to go to counseling because she wanted to protect them. (Tr. 32-33). Mrs. Foucht also minimizes the abuse that she receives as a victim of domestic violence, which the Court sees as a problem in her ability to recognize abuse and to be able to protect said children from any further acts of abuse towards them. (Tr. 34). In fact, Dr. Rivera testified that if the children were to be returned home, he did not feel that Mrs. Foucht could adequately protect herself and her kids. (Tr. 48).
 {¶ 6} "Mr. and Mrs. Foucht still have not completed parenting classes, which was an objective in their case plans. It was recommended by caseworker Marilee Cox on August 19, 2001 to attend parenting classes, and she even provided the parents with a list of people that she had contacted concerning the availability of parenting classes. (Tr. 58). However, they did not begin parenting classes until recently and had not completed them at the time of the hearing. Additionally, the Court finds it troublesome that the parents, who have admitted to having problems in this area, have not completed substance abuse classes. (Tr. 59). Crisis Care did state there was no need for treatment at the time, but part of their assessment came from the fact that Mr. and Mrs. Foucht did not acknowledge any problems so referring them would not be helpful. There are police reports and a report from the children that alcohol consumption was excessive in the home, so all of this information is conflicting. (Tr. 59).
 {¶ 7} "It has not been shown that stable housing is available for the children. Mr. and Mrs. Foucht currently live with Mr. Foucht's father, since Mr. Foucht lost his job. (Tr. 59). The Court is concerned with the fact that this home is not owned by the parents, that it is not furnished with beds for said children, and this house is one in which there are reports of threats to the girls, so returning the children to this home may be very traumatic for them. (Tr. 60).
 {¶ 8} "Most of all, the Court has concerns with the living environment that the children have been submitted to when they resided with Mr. and Mrs. Foucht, which may be evidenced by their behavior. Taylor has made advances toward gentlemen in her foster home, has inappropriately grabbed her teachers at school, and has said inappropriate things concerning animal sex and self-gratification. (Tr. 70). Dr. Ott, the children's psychologist, reported that Tiffany also exhibited aggressive and sexually inappropriate behavior. (Tr. 84). Both children have discussed fears of what would happen if they were reunited with their parents, such as the possibility of being hurt, excessive drinking by their parents, and domestic violence between their parents. (Tr. 70). Tiffany has even expressed concerns that there would be no food for her to eat if she was returned to live with her parents. (Tr. 88). Taylor has made reports of being punched by her father, and both children have expressed desires not to return to their parents, especially Tiffany. (Tr. 103, 115). This evidence leads the Court to believe that the children were not encouraged to exhibit positive behavior by Mr. and Mrs. Foucht, which has in turn led to various public displays of negative behaviors of the children.
 {¶ 9} "Caseworker, Marilee Cox testified that she believed granting permanent custody to MCCS was in the best interests of the children. (Tr. 70). Guardian Ad Litem, Mark Fisher, also believes that granting permanent custody of the children to MCCS is in their best interest, because it is unlikely that the parents can remedy their home environment in a reasonable time and the children need stability and permanency. There are no problems with the current placements that said children are in. (Tr. 121). For these reasons, the Court finds it to be in the best interest of the children to grant permanent custody to MCCS.
 {¶ 10} "With the above determinations, the Court hereby adopts the Decision of the Magistrate, as its own, with all the provisions and requirements contained therein, and hereby makes the same the Order of this court." (Docket 124).
 {¶ 11} The parents, represented by separate counsel for each, have filed separate briefs in this appeal. The two Foucht parents will be referred to for clarity by their first names. Donna's brief, as the mother, presents a single assignment of error, to-wit: The trial court erred when it granted permanent custody to Montgomery County Children's Services.
 {¶ 12} Robert's brief, as the biological father, presents five assignments of error, but its third assignment is the same as that of Donna's assignment, and we shall treat them together.
 {¶ 13} We have carefully read the transcripts of the two hearings on this matter, and we find that the evidence and testimony elicited amply support, clearly and with credibility, the decision of the Juvenile Court. The following excerpts from the transcript of the October 28, 2002, hearing are examples of the situation the two girls were in and support at least some of the reasons given by the trial court in this decision:
 {¶ 14} "Q. And at the time you left the case, were they still living with Mr. Foucht's father?
 {¶ 15} "A. Yes, they were.
 {¶ 16} "Q. Did you have a chance to observe that housing?
 {¶ 17} "A. Yes, I did.
 {¶ 18} "Q. And was it appropriate for Tiffany and Taylor?
 {¶ 19} "A. It wasn't set up with beds for them. There was a bedroom that they could have went into. The concerns that I had was that the case had reports that there were incidents of threats made to the girls in that home. Visits were stopped while they were at that house because of some threats that had been made to the girls. So, I have real concerns about them going back into the home one way or the other.
 {¶ 20} "Q. With regards to Tiffany and Taylor, what were their concerns on the case plan?
 {¶ 21} "A. The issues that Tiffany and Taylor faced were around sexual abuse and the need to protect themselves, and learn some of the things that they had went through, and how they could not go through that again. (Tr. 60-61).
 {¶ 22} "* * *
 {¶ 23} "Q. Do you consider mother's case plan to be complete?
 {¶ 24} "A. No. There's issues that definitely need to be addressed. The domestic violence, the possibility of drug abuse, those are things — the alcohol abuse, those are still issues. The housing. Those are things that need to be continued to be addressed.
 {¶ 25} "Q. And do you believe father's case plan to be complete?
 {¶ 26} "A. No. For the same reasons. (Tr. 65).
 {¶ 27} "* * *
 {¶ 28} "Q. During the time in which you were the caseworker, did you believe it was in Tiffany and Taylor's best interest for permanent custody to be granted to Montgomery County Children Services?
 {¶ 29} "A. Yes, I did. The reason being is that both kids had told me at various times that they were fearful of what would happen if they went back into the house. Both kids had talked to me about the possibility of being hurt, physically. They were afraid of the drinking and the domestic violence that went on between Mr. and Mrs. Foucht." (Tr. 70). The answers given as quoted above were by Marilee Cox, the caseworker for the girls until January 15, 2002.
 {¶ 30} The following excerpts are from the testimony of Dr. Brenda Joyce Ott, a psychologist at Children's Medical Center of Dayton, who was stipulated to be an expert:
 {¶ 31} "Q. We are here on the case of Taylor and Tiffany Foucht. Are you familiar with those two children?
 {¶ 32} "A. Yes, I am.
 {¶ 33} "Q. How are you familiar with those two children?
 {¶ 34} "A. They were referred to me for therapy in January of 2001.
 {¶ 35} "Q. And, originally what was the referral for?
 {¶ 36} "A. The referral was made based on disclosure of sexual abuse by their brother.
 {¶ 37} "Q. Who made the disclosure?
 {¶ 38} "A. Taylor is the one who made the initial disclosure. (Tr. 82).
 {¶ 39} "* * *
 {¶ 40} "Q. And is she [Taylor] referring to the sexual abuse of Joey?
 {¶ 41} "A. At one point she was referring to the sexual abuse by Joey. At other times it was by her father and by Mike.
 {¶ 42} "Q. And Michael is the half brother?
 {¶ 43} "A. Yes. (Tr. 92).
 {¶ 44} "* * *
 {¶ 45} "Q. Did she [Taylor] give you reasons why she did not want to go home?
 {¶ 46} "A. At that point it was because the physical abuse that she reported had occurred to her by her parents.
 {¶ 47} "Q. Are you distinguishing physical abuse from sexual abuse?
 {¶ 48} "A. Yes, I am.
 {¶ 49} "Q. Can you tell the Court what kind of physical abuse that she described that she suffered?
 {¶ 50} "A. She reported that she was hit and punched.
 {¶ 51} "Q. By who?
 {¶ 52} "A. By her father." (Tr. 115-116).
 {¶ 53} At the conclusion of the hearing, the children's two attorneys both recommended permanent custody to MCCS. The following excerpts are from the testimony of Roy Sturgill, who is the continuing caseworker from MCCS, given at a November 6, 2001 hearing:
 {¶ 54} "Q. Okay, back when this was previously decided why did the agency file for a suspension of visits?
 {¶ 55} "A. We were given information in the form of letters written by one of the children to her therapist that were dated and signed by the child in which she mentioned threats being made to both herself and her sister by both parents during visitations which were occurring at grandfather's house and in the presence of grandfather and grandfather was not taking any actions to stop those threats or behaviors toward the child.
 {¶ 56} "Q. Who was making the threats?
 {¶ 57} "A. Both parents, father and mother. (Tr. 26).
 {¶ 58} "* * *
 {¶ 59} "A. The child who originally wrote the letters went into detail about what happened, where it happened, how many times it happened and who was involved and —
 {¶ 60} "Q. With regards to the threats?
 {¶ 61} "A. To the threats, yes.
 {¶ 62} "Q. Okay, and generally what was — what was the detail given?
 {¶ 63} "A. That they were — that she was very, very afraid that her father would cut her feet off with the chain saw if she said anything about anything having to do with Michael and that her mom had told her that she would take a knife and cut her if she said anything about Michael or anything else going on.
 {¶ 64} "Additionally the — both children have mentioned watching porno tapes and while they were watching the porno tapes being encouraged by the parents to mimic some behaviors that were on the porno tapes." (Tr. 27).
 {¶ 65} The decision of a trial court granting or denying an agency's request for permanent custody of a child must be made upon the basis of clear and convincing evidence presented to the court. See, e.g., Ross v. Prater (Sept. 11, 1998), Montgomery App. No. 16582. The trial court's determination in a custody proceeding is subject to reversal only on a showing of an abuse of discretion and: "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record, . . . In this record, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." Miller v. Miller
(1988), 37 Ohio St.3d 71, 74, citations omitted. We find that the trial court's decision in this matter granting permanent custody of both girls to the MCCS did not constitute an abuse of discretion and, indeed, is amply supported by clear and convincing evidence, a few excerpts of which are quoted above. Appellant Donna's assignment of error is overruled and Robert's third assignment of error is overruled.
 {¶ 66} In his first two assignments of error, Robert is questioning whether Dr. Rivera's testimony should have been allowed by the trial court. The determination of an expert's qualifications testifying on a particular subject is within the sound discretion of the trial court and its decision should not be reversed unless the reviewing court finds the trial court has abused its discretion. State v. Jones (2000),90 Ohio St.3d 403, 414. Dr. Rivera's expert qualifications were amply listed on the record and while she is not a licensed psychologist, there was no testimony that she was incapable of interpreting results of a personality test, referred to as MMPI. The record shows that Dr. Rivera conducted the MMPI test under the supervision of a licensed psychologist, as required, and this licensed psychologist signed off on her work as a finding of an appropriate interpretation result of the test.
 {¶ 67} Robert's second complaint is that he was subjected to a modified sex offender evaluation without first having been convicted of a sex offense. The sexual evaluation of Robert is recommended by Dr. Pignatiello, a psychologist who routinely deals with persons who have been alleged to have committed sexual abuse. The court did not abuse its discretion here either. Robert also complains that Dr. Rivera was not qualified to evaluate him because she currently works with female sex offenders. The record demonstrates, however, that she has interviewed approximately 200 male sex offenders. The trial court did not commit any abuse of discretion here either.
 {¶ 68} Robert's last two assignments of error are as follows:
 {¶ 69} "4. The trial court erred by relying upon the parents' failure to place the children in counseling when it was impossible for them to do so because the children were in foster care.
 {¶ 70} "5. The trial court erred by resorting to a grant of permanent custody when less drastic means were available to promote the children's best interest."
 {¶ 71} Both of these assignments question the decision of the juvenile court granting permanent custody of the two girls to MCCS. As such, the specific questions raised in these two assignments of error were dealt with by the trial court as exhibited in its decision. Having found that the decision of the trial court was not an abuse of discretion and is supported by clear and convincing evidence, these last two assignments of error are subsumed under the final decision of the juvenile court and are also therefore overruled.
 {¶ 72} The judgment is affirmed.
Brogan, J. and Grady, J., concur.